IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

FILED
2005 NOV -2 P 2: 19

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

| | |
|---|---|
| MARION WOODMANSEE,<br><br>        Plaintiff,<br><br>    v.<br><br>GARY CHRYSTLER,<br><br>        Defendant. | Case No. 2:05-CV-211 DB<br><br><br><br>**REPORT AND RECOMMENDATION** |

Before the court is a motion for summary judgment filed by pro se Plaintiff, Marion Woodmansee.  (File Entry #11.)  Having carefully reviewed the parties' pleadings, and having heard oral arguments in this matter, the court hereby submits this report and recommendation.

### BACKGROUND

Because this case is before the court on Plaintiff's motion for summary judgment, the facts and any reasonable inferences drawn therefrom are presented in the light most favorable to Defendant, the nonmoving party.  *See Sealock v. Colorado*, 218 F.3d 1205, 1207 (10th Cir. 2000); *Mann v. United States*, 204 F.3d 1012, 1016 (10th Cir. 2000).

At oral arguments, Plaintiff admitted to the court that he obtained a credit card from First National Bank of Omaha, N.A.

(hereafter referred to as "First National"), in 1988.  (Official
Transcript of Oral Arguments on Motion for Summary Judgment,
August 4, 2005 (hereafter referred to as "8-4-05 Transcript"), at
12.)  Plaintiff used that credit card to purchase items and made
payments on the credit card.  (8-4-05 Transcript, at 12.)
Plaintiff did not pay the total balance on his credit card bill
each month, so Plaintiff paid First National interest on his
unpaid balance.  (8-4-05 Transcript, at 12-13.)

According to Plaintiff's explanation given to the court at
oral arguments, at a certain point Plaintiff's wife developed
Alzheimer's Disease, resulting in substantial medical payments
and nursing home care payments.  (8-4-05 Transcript, at 13-14.)
Then, following Plaintiff's wife's death, Plaintiff's wife's
pension stopped being paid.  (8-4-05 Transcript, at 14.)
Plaintiff explained to the court that following these events,
Plaintiff became unable to make the required credit card payments
to First National, and so Plaintiff's payments to First National
ceased.  (8-4-05 Transcript, at 14.)

On October 8, 2004, Defendant, acting as counsel for First
National, sent Plaintiff a written demand for payment of his
past-due credit account balance of $19,928.68.  (File Entry #13,
at 1-2, Exhibit B.)  Defendant's October 8 letter to Plaintiff
explained that if Plaintiff did not contact Defendant's office
within ten days from the date of the letter, Defendant would
advise First National to commence legal action to recover the

amount due.  Attached to Defendant's letter was a "Notice of
Rights Pursuant to 15 USC Section 1692g."  That notice explained
that unless Plaintiff disputed the debt within 30 days from
Plaintiff's receipt of the notice, Defendant's office would
assume the debt was valid.  The notice explained that if
Plaintiff disputed the debt within 30 days, Defendant would
suspend collection efforts and send Plaintiff verification of the
debt.

 Plaintiff did not respond to Defendant's letter within ten
days.  (File Entry #13, at 2.)  As a result, pursuant to the
instructions of Defendant's client First National, Defendant
filed a collection Complaint in the Fourth Judicial District
Court of Utah County, State of Utah, on November 15, 2004, well
over thirty days after Defendant's October 8, 2004 letter to
Plaintiff was sent.  (File Entry #13, at 2, Exhibit A.)

 Plaintiff then sent Defendant a letter dated December 1,
2004.  (File Entry #13, at 2, Exhibit C.)  The December 1 letter
acknowledged Plaintiff's receipt of Defendant's October 8 letter.
Plaintiff set forth various reasons in the December 1 letter of
why he believed Defendant did not have a legal right to pursue
the collection of Plaintiff's credit card debt.

 After receiving Plaintiff's December 1 letter, Defendant
sent Plaintiff a letter two days later, on December 3, 2004,
notifying Plaintiff that his December 1 letter was being treated
as a request for validation pursuant to the Fair Debt Collections

Practices Act (hereafter referred to as "FDCPA") and that he was appending to the letter documents validating Plaintiff's debt. (File Entry #13, at 2-3, Exhibit D.)  However, according to Plaintiff's affidavit, Plaintiff is "not in receipt of any document proferred by either [Defendant] or [First National] that verifies that [Plaintiff] owed the alleged debt [Plaintiff] or [First National] were attempting to collect."  (File Entry #11, at 6.)

Defendant explained at oral arguments that the state court proceedings continued, even after Plaintiff disputed the debt. (8-4-05 Transcript, at 10.)  Defendant explained that the state court issued a summary judgment in Defendant's favor for a principal sum of $19,906.89.  (8-4-05 Transcript, at 10.) Plaintiff did not attempt to contradict this statement.

Plaintiff filed his complaint in this case on March 10, 2005, and the case was assigned to United States District Judge Dee Benson.  (File Entry #1.)  Defendant filed his answer on March 21, 2005.  (File Entry #4.)  Plaintiff then filed a reply to Defendant's answer on April 4, 2005, and a supplemental reply brief on April 20, 2005.  (File Entries #6, 9.)

On June 14, 2005, Plaintiff filed a motion for summary judgment and a statement of uncontroverted facts and conclusions of law in support of his motion.  (File Entries #10, 11.) Defendant filed a memorandum in opposition to the motion for summary judgment, along with Defendant's affidavit, on June 16,

4

2005.  (File Entries #12, 13.)  Plaintiff then filed a reply to Defendant's memorandum in opposition on June 27, 2005.  (File Entry #15.)

On June 20, 2005, Judge Benson referred the case to United States Magistrate Judge Samuel Alba pursuant to 28 U.S.C. § 636(b)(1)(B).  Judge Alba held a hearing on the motion for summary judgment on August 4, 2005, during which both pro se parties presented oral arguments.  (File Entry #17; 8-4-05 Transcript.)

## ANALYSIS

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.  "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997), *cert. denied*, 522 U.S. 1148 (1998).  Unsupported conclusory allegations, however, do not create an issue of fact.  *See Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir.), *cert. denied*, 125 S. Ct. 47 (2004).

A party moving for summary judgment bears the burden of showing that no genuine issue as to any material fact exists,

"and for these purposes the [evidence] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."); *Sealock*, 218 F.3d at 1207, 1209.  The moving party may do so by identifying portions of the record which demonstrate no genuine issue of material fact exists.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its initial responsibility of informing the court of the basis for its motion, the nonmoving party must then sufficiently show "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.  If the nonmoving party fails to meet this burden, the moving party is entitled to summary judgment "because the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Id. at 323; *see also Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999), *cert. denied*, 528 U.S. 815 (1999).

Because both Plaintiff and Defendant are acting pro se, the court construes their pleadings liberally.  *See Cannon v. Mills*,

6

383 F.3d 1152, 1160 (10th Cir. 2004), *cert. denied*, 125 S. Ct. 1664 (2005).

Plaintiff brought this case against Defendant alleging that Defendant violated the FDCPA.  Plaintiff appears to make seven main arguments to support his motion for summary judgment. First, Plaintiff appears to argue that Defendant either phoned Plaintiff or had others phone Plaintiff to harass Plaintiff, in violation of the FDCPA.  *See* 15 U.S.C. § 1692c (2005).  This argument is not supported by any sworn statement, but instead is presented as a conclusory allegation.  Furthermore, Defendant's affidavit contradicts this argument.  Defendant stated in his sworn affidavit that he "never contacted Plaintiff or his residence by any means other than written communication."  (File Entry #13, at 3.)  Because Plaintiff has not properly supported this argument, and because Defendant's affidavit directly refutes this argument, Plaintiff has failed to properly support this argument, and the court rejects it.

Plaintiff's second argument is that Defendant was required to cease his collection of the debt once Plaintiff disputed the debt.  The FDCPA states that a debt collector must provide the debtor, either with the initial communication to the debtor or within five days of the initial communication, a written notice containing the amount of the debt; the name of the creditor; a statement that if the debtor does not dispute the validity of the debt within thirty days the debt would be presumed valid; a

statement that if the debtor does dispute the debt within the thirty-day period, the debt collector would send the debtor validation of the debt; and a statement that, upon the debtor's request within the thirty-day period, the debt collector would provide the debtor with the name and address of the original creditor if it differed from the current creditor.  *See* 15 U.S.C. § 1692g(a) (2005).  Defendant provided all of this information to Plaintiff with his December 3, 2004 letter, his first communication with Plaintiff.  (File Entry #13, at 2-3, Exhibit D.)  The FDCPA also provides the following:

> If the consumer notifies the debt collector in writing *within the thirty-day period* described in subsection (a) of this section that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, *until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.*

15 U.S.C. § 1692g(b) (2005) (emphasis added).  Plaintiff's argument that Defendant had to cease collection of the debt once Plaintiff disputed the debt is thus simply a misreading or misapprehension of the statute.  Under the statute, if the debtor disputes the debt in writing within the thirty days of receiving the notice of the debt and the debtor's rights, a debt collector

can resume collection of the debt once the debt collector sends verification of the debt to the debtor.

Thus, based on the statute's plain language, Plaintiff's second argument fails for two reasons.  First, under section 1692g(b), to trigger the debt collector's obligation to send validation of the debt, the debtor is required to dispute the debt within thirty days of receiving the debt collector's official notice of the debt.  However, in this case, Plaintiff did not challenge the debt until after the thirty day period was over.  Defendant sent Plaintiff the original letter demanding payment accompanied by the required notice of Plaintiff's rights pursuant to 15 U.S.C. section 1692g, on October 8, 2004.  However, Plaintiff did not respond to Defendant's letter and notice until December 1, 2004, well outside of the required thirty day period.  As a result, because Plaintiff failed to respond to Defendant's letter within the required thirty day period, Plaintiff failed to trigger Defendant's duty to validate the debt.  Defendant was thus allowed to presume the debt was valid, and, as a result, Plaintiff's second argument fails.

The second reason Plaintiff's second argument fails is that, in presenting his argument to the court, Plaintiff appears to have created a genuine issue of material fact.  As discussed in the background section above, Plaintiff declared in his affidavit that he is "not in receipt of any document proferred by either [Defendant] or [First National] that verifies that [Plaintiff]

9

owed the alleged debt [Plaintiff] or [First National] were
attempting to collect." (File Entry #11, at 6.)  Thus,
Plaintiff's affidavit appears to say that he never received the
validation of the debt Plaintiff enclosed with his December 3
letter.  The court is somewhat puzzled by this sworn statement
because of information Plaintiff included in his response to
Defendant's December 3 letter.  On December 7, 2004, Plaintiff
sent Defendant another letter, in which Plaintiff referred to the
following various documents sent by Defendant to Plaintiff:  an
affidavit, copies of checks, and copies of monthly statements.
(File Entry #13, Exhibit E.)  These documents referred to by
Plaintiff in his December 7 letter are the very same documents
Defendant sent Plaintiff with his December 3 letter validating
the debt.  In his December 7 letter, Plaintiff referred to these
documents in terms of his argument that Plaintiff is required to
present Plaintiff with the original, not a copy, of the credit
card agreement.  Thus, because Plaintiff specifically referred to
these documents in his December 7 letter, it is possible that
Plaintiff's statement in his affidavit simply means that, in
Plaintiff's opinion, those documents did not properly validate
the debt, rather than that Plaintiff never received the documents
Defendant appended to his December 3 letter to validate the debt.
However, because this is a motion for summary judgment, the court
is not allowed to resolve this issue of material fact.  Instead,
the court must view the evidence in the light most favorable to

Defendant, the opposing party.  Taking Plaintiff's statement in his affidavit to mean that he did not receive the validation documents places this material fact in genuine dispute.  Thus, such a reading not only is reasonable, but it also and is most favorable to Defendant, as it results in the failure of Plaintiff's summary judgment.  As a result, Plaintiff's second argument also fails because Plaintiff has not met his burden to show the court that no genuine issue of material fact exists.

Plaintiff's third argument is that in order for Defendant to properly verify the debt, Defendant was required to present Plaintiff with the original credit card agreement containing Plaintiff's promise to pay.  As explained above, Plaintiff did not dispute the debt within the required thirty day period to trigger Defendant's duty to verify the debt; thus, Defendant was allowed to presume the debt was valid.  As a result, because Defendant was able to presume the debt was valid, Defendant was not required to provide verification of Plaintiff's debt, the court need not address Plaintiff's verification argument, and the court therefore rejects Plaintiff's third argument.

Nevertheless, even though the court need not address Plaintiff's argument that Defendant was required to submit the original credit card agreement, because the case is continuing and Plaintiff may raise the argument again, the court has opted to address Plaintiff's argument here.  Plaintiff supports his argument with *In re. Maxwell*, 281 B.R. 101 (Bkrtcy. D. Mass.

11

2002), which held that the FDCPA applied to the company that serviced a residential mortgage loan, and that the company violated the FDCPA by demanding amounts for which it had no documentation support because it did not have a copy of the mortgage note or a written history of the borrower's payments. *See id.* at 117-120.  Plaintiff also supports his argument with cases holding that foreclosure on a mortgage requires that the original note be presented.  These cases are neither binding on this court nor do they apply to the current case.  The cases cited by Plaintiff are either state cases or cases from other circuits, and are therefore not binding on this court. Furthermore, they are not even persuasive because their facts greatly distinguish them from the instant case.  This case does not involve the foreclosure of real property, but instead involves the collection of credit card debt.  Thus, the cases cited by Plaintiff regarding the foreclosure of real property are inapplicable.  Furthermore, contrary to what Plaintiff suggests, the *Maxwell* case does not require a creditor to present the original credit card agreement to the debtor; instead it requires a creditor to have sufficient documentation to support the demands the creditor makes of the debtor.

In addition, the court has conducted its own research on this issue and has found no applicable cases or statutes that support Plaintiff's position.  Rather, the documentation appended to Defendant's December 3 letter adequately validates Plaintiff's

debt.  Furthermore, that documentation even appears to comply
with the requirements set forth in the material appended by
Plaintiff to his pleadings; namely, in addition to a copy of the
cardholder agreement Plaintiff consented to when he began using
his credit card, Defendant submitted an affidavit of a manager at
First National regarding the amount of principal owed by
Plaintiff on his account, copies of checks written by Plaintiff
and sent to First National to be applied to his credit card
account, and copies of nine monthly statements sent to Plaintiff
by First National.  (*See* File Entry #10, Plaintiff's Motion for
Summary Judgment, Exhibit 1, at 2 (explaining that validation
requires presentment of the account and general ledger statement
and not just a copy of the consumer credit contract)).

Plaintiff's fourth argument appears to be that First
National assigned the debt to Defendant, and that the law does
not allow a credit card debt to be assigned.  The court rejects
this argument because Plaintiff has made no showing that First
National assigned its debt to Defendant.  On the contrary, all
documentation and statements presented to the court support that
Defendant was acting as an attorney for First National.  Simply
because Defendant is subject to the requirements of the FDCPA
does not mean that First National assigned the debt to Defendant.

Plaintiff's fifth argument is that because First National
has already written off Plaintiff's credit card debt, it should
not be allowed to collect on that debt now.  Plaintiff's argument

13

appears to be that First National has no legal claim against him because the debt was already written off and, according to Plaintiff, First National has probably already collected on the debt from its insurance policy.  However, Plaintiff is suing Defendant, the attorney who represented First National in collecting on Plaintiff's credit card debt, by alleging that Defendant violated the FDCPA.  Plaintiff has not explained how First National writing off Plaintiff's debt is relevant to this case brought against Defendant, or how this supposed action of First National supports Plaintiff's allegations that Defendant violated the FDCPA.  As a result, the court refuses to further examine this argument and therefore rejects it.

Sixth, Plaintiff also argues that the state judgment obtained against Plaintiff in favor of First National is void because the state judge lacked jurisdiction.  Again, as with Plaintiff's fifth argument, Plaintiff has failed to explain how this argument is relevant to his case against Defendant. Furthermore, other than by making conclusory allegations and declarations regarding void judgments, Defendant has not shown why the state court judgment is void.[1]  Therefore the court also rejects Plaintiff's sixth argument.

---

[1]In addition, the court notes that if Plaintiff desires to challenge the state court judgment, he must do so by appealing in the proper forum, in the state court system, rather than by filing a case in federal court.

Finally, Plaintiff argues repeatedly that Defendant lacked "jurisdiction" because he was a "third party debt collector." The court has been unable to discern what Plaintiff is trying to argue and has concluded that this argument is based on a misunderstanding of the law.  The court notes for Plaintiff's benefit that only courts have jurisdiction; litigants do not. Therefore, this argument makes no sense and the court declines to further address it.

**RECOMMENDATION**

Based on the above analysis, **IT IS HEREBY RECOMMENDED** that Plaintiff's motion for summary judgment (File Entry #11) be **DENIED**.

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby notified of their right to object to the same.  The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. § 636(b), within ten (10) days after receiving it.  *See* 28 U.S.C. §

636(b)(1) (2005).  Failure to file objections may constitute a
waiver of those objections on subsequent appellate review.

DATED this _____ day of November, 2005.

BY THE COURT:

Samuel Alba
United States Chief Magistrate Judge

1          IN THE UNITED STATES DISTRICT COURT

2                   DISTRICT OF UTAH

3                   CENTRAL DIVISION

4

5   MARION WOODMANSEE,              )

6          Plaintiff,              )

7   vs.                            )    CASE NO.  2:05-CV-211DB

8   GARY CHRYSTLER,                )

9          Defendant.             )

10  _____ )

11

12          BEFORE THE HONORABLE SAMUEL ALBA

13

14      ----------------------------------

15                 August 4, 2005

16

17

18

19

20          Motion for Summary Judgment

21

22

23

24

25

```
1                          A P P E A R A N C E S

2

3

4    For Plaintiff:                 MARION WOODMANSEE
                                    587 South 300 East
5                                   Payson, Utah 84651

6

7    For Defendant:                 GARY L. CHRYSTLER
                                    363 North University Avenue
8                                   P.O. Box 1045
                                    Provo, Utah  84603
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   August 4, 2005                                10:00 a.m.

 2                       P R O C E E D I N G S

 3

 4            THE COURT:  Let's go on the record in the matter that

 5   is currently before me.  It is in the matter of Marion

 6   Woodmansee versus Gary Chrystler.

 7            MR. CHRYSTLER:  Chrystler, Your Honor.

 8            THE COURT:  Okay.  This is a case that is assigned to

 9   Judge Benson.  It is before me on an order of reference from

10   him so that I can review it and prepare a report and

11   recommendation on the motion for summary judgment, wherein I

12   give the judge my advice in terms of what he ought to do with

13   the case.

14            The way this works is as follows:  The motion is

15   filed, the order of reference comes in, I hear the argument of

16   the parties, and I will prepare a report and recommendation.  I

17   will give it to the judge and the parties will have ten days in

18   which to file any objections that you may have to my report and

19   recommendation.  And then the judge can either adopt it in

20   whole, adopt a portion of it only, or reject it totally.  It is

21   entirely up to him.  He reviews it de novo.  That means that he

22   reviews the evidence all together again in making that

23   determination.

24            Now, who is here?  Why don't you note your

25   appearances today for purposes of these proceedings.  Who do we
```

1    have here?

2            MR. WOODMANSEE:  Marion Woodmansee, Your Honor.

3            THE COURT:  And you're the plaintiff in this case?

4            MR. WOODMANSEE:  Yes.

5            THE COURT:  All right.

6            MR. CHRYSTLER:  Gary Chrystler, the defendant.

7            THE COURT:  Thank you.

8            Let me tell you what I have done in preparation for

9    the hearing here this morning.  Mr. Woodmansee, I have reviewed

10   your motion for summary judgment.  I have reviewed the brief in

11   support thereof.  You have also appended to it certain things

12   that you had referenced in your materials, and I have reviewed

13   that information.  I have a plaintiff's statement of

14   uncontroverted facts and conclusions of law in support of your

15   motion for summary judgment.  I have reviewed that.

16           I have Mr. Chrystler's memorandum in opposition to

17   the motion for summary judgment, his affidavit as well, along

18   with a number of exhibits that he references in the affidavit.

19   I have had an opportunity to go through those.  And then there

20   is a reply that the plaintiff has filed in this case to the

21   materials submitted by the defendant in this case.  To me it

22   looks to be going over the same information that was included

23   in the original material.  That reply also includes certain

24   attachments that I have had an opportunity to go through and

25   review as well.  They seem to be from the Federal Register.

1          So with that in mind, Mr. Woodmansee, anything else

2    that you wish to add at this time concerning your motion?

3          MR. WOODMANSEE:  Well, yes, Your Honor.  I would like

4    to make a summary judgment court statement.

5          THE COURT:  Okay.

6          MR. WOODMANSEE:  Your Honor, I have legal evidence,

7    not opinion, proving that the defendant has no viable defense

8    against the plaintiff.  The defendant has not and cannot

9    provide any proof that he has a legal claim against the

10   plaintiff.

11         THE COURT:  Well, let me stop you there for a minute.

12   Okay.

13         MR. WOODMANSEE:  Sure.

14         THE COURT:  It is not that he has a legal claim

15   against you, it is that he is acting on behalf of someone who

16   has a legal claim against you.  That is how lawyers practice.

17   Most of the time they don't have an action against the

18   individuals.  It is part of their responsibility to represent

19   businesses, entities, corporations, banks, financial

20   institutions, in bringing actions when they are trying to

21   collect certain debts that are owed to those institutions.

22         So with that in mind, continue.

23         MR. WOODMANSEE:  Well, without the legal evidence of

24   a valid legal claim against the plaintiff he is acting as a

25   thief trying to steal money from the plaintiff.

1      THE COURT:  See, I won't stand for that,

2  Mr. Woodmansee.  I won't stand for any characterization of

3  individuals in front of me like that.  This is not the place to

4  do that.

5      Number one, you submitted certain documents to him

6  after he filed the action in state court, or prior to that, I

7  guess the notice went to you.  He took that to mean that you

8  wanted certain evidence of the indebtedness.  He submitted

9  documents to show that.  You have taken the position that that

10 does not apply to you.

11     What else do you want to tell me?  But I don't want

12 you to characterize individuals in that manner.  This is not

13 the time nor the place to do so.

14     MR. WOODMANSEE:  Yes, Your Honor.  We are dealing

15 with the Fair Debt Collection Practices Act.

16     THE COURT:  I understand that and I have that in

17 front of me.  What specifically about that is it that you are

18 relying on?

19     MR. WOODMANSEE:  15 U.S.C. Section 1692 clearly

20 states that anyone but the original lender is a third party

21 debt collector and is subject to Section 1692.

22     THE COURT:  That is part of the statute.  That is not

23 what all of the statute says.

24     MR. WOODMANSEE:  The defendant is not the original

25 lender and is subject to Section 1692 that states, when a

1    debtor states that the debt is in dispute, the debt collector

2    must cease and desist any collection activity, or the debt

3    collector is in violation of Section 1692.

4         THE COURT:  See, Mr. Woodmansee, that is the beauty

5    of people who try to represent themselves.  You pick and choose

6    specific things from the statute without reading it totally.

7    Okay.  That concerns me.

8         Go ahead.

9         MR. WOODMANSEE:  Since the defendant has refused to

10   cease and desist, the defendant is in clear violation of

11   Section 1692.  The U.S. Supreme Court in the Heintz versus

12   Jenkins case ruled that debt collector attorneys have no

13   jurisdiction under 1692.  I have a copy of that Heintz versus

14   Jenkins case.  I think you may have one as well, but if not I

15   have another one.

16        THE COURT:  You cited it in your materials.  Remember

17   what I started this whole thing with this morning?  I have

18   reviewed the materials.  Is there something new that you want

19   to add at this time?

20        MR. WOODMANSEE:  I believe not, Your Honor.  We'll

21   see what the defendant has to offer.  I may want a rebuttal.

22        THE COURT:  That will be fine.

23        Let's listen to what he has to say, and then I'll

24   give you an opportunity to reply to him.

25        MR. WOODMANSEE:  Thank you, Your Honor.

```
 1              THE COURT:  Okay.  Counsel?

 2              MR. CHRYSTLER:  Thank you, Your Honor.

 3         Your Honor, as I have received the various documents

 4    and pleadings from the plaintiff, it has been somewhat

 5    difficult for me to determine what his cause of action is and

 6    what his claim is.  The best that I can figure out, and I may

 7    be incorrect, but it seems to me like he is claiming first of

 8    all that he never received the debt validation that I sent him.

 9    I do have a letter addressed to me, and the first sentence

10    says, this is in response to your letter of December 3rd, 2004.

11              THE COURT:  For purposes of the record, that letter

12    of December the 3rd of 2004 is the one that appended to it all

13    of the materials that you had submitted to him; is that

14    correct?

15              MR. CHRYSTLER:  That is correct.

16              THE COURT:  That is one of the exhibits that you

17    included in your response?

18              MR. CHRYSTLER:  That is correct.  That is the debt

19    validation letter.  That letter enumerated the attachments.

20    Nowhere in this letter from -- this December 7th letter that

21    I'm referring to now is signed by Mr. Woodmansee.  Nowhere in

22    this letter does he indicate that he didn't receive the

23    attachments to that letter.  Therefore, I think we need to

24    presume that he did.  He swears under oath that he never

25    received the debt validation.  That concerns me.
```

1          The other issue, I suppose, and I may be reading this

2    into what he has presented in document form, but it seems like

3    he is claiming that once a debtor puts into dispute a debt that

4    a third party debt collector is attempting to collect, then

5    that third party debt collector can't proceed.  That is not the

6    law, but that is the only thing that I can figure out that he

7    is --

8          THE COURT:  When you say that that is not the law,

9    what specifically are you referring to?

10         MR. CHRYSTLER:  The Fair Debt Collection Practices

11   Act says if the debtor disputes the debt, all collection

12   activities must cease until such time as validation has been

13   sent.

14         THE COURT:  Once validation is sent, then further

15   debt collection activity can continue?

16         MR. CHRYSTLER:  That is my understanding.

17         THE COURT:  Including the filing of a lawsuit?  That

18   is your reading of what the statute is?

19         MR. CHRYSTLER:  Well, I'm not sure that that is even

20   relevant, because if you look at the file, Mr. Woodmansee never

21   put the debt in dispute until after the complaint was filed.

22   But we did cease and tolled the running of the summons until

23   such time as we provided that debt validation, and then there

24   was no further response -- well, there was a response from

25   Mr. Woodmansee that sort of, I guess, reiterated what he had

1    already sent, and then we proceeded.

2          We have now obtained a judgment by summary judgment

3    in the state court.  We just did that a few weeks ago.  That is

4    where it stands.

5          THE COURT:  So the proceedings in state court

6    continued; is that correct?

7          MR. CHRYSTLER:  It did.

8          THE COURT:  Up to judgment?

9          MR. CHRYSTLER:  After we provided the debt

10   validation.

11         THE COURT:  Have any efforts been made at all to

12   collect on that judgment?

13         MR. CHRYSTLER:  No.

14         THE COURT:  Is the judgment in the amount that you

15   originally claimed, in excess of $19,000?

16         MR. CHRYSTLER:  The judgment was for a principal sum

17   of $19,906.89.  That is the amount alleged in the complaint and

18   in the collection act that was originally sent to

19   Mr. Woodmansee.

20         THE COURT:  Thank you.  I understand your position.

21         Mr. Woodmansee, anything in reply?

22         MR. WOODMANSEE:  Yes, Your Honor.

23         As far as the judgment is concerned, that is a void

24   judgment because Judge Scofield acted without jurisdiction, and

25   he will have an opportunity to defend himself against that

1   charge.

2          There are several situations here which I would like

3   to address, if you don't mind.  The one major thing to start

4   with is all banks, including the First National Bank of Omaha,

5   are governed by the U.S. Comptroller of the Currency.  There

6   are no exceptions.  In June of 2000 the Comptroller of the

7   Currency issued a June 2000 bulletin requiring all banks to

8   write off all unsecured customer debt that is more than 180

9   days in arrears.

10          THE COURT:  Let me stop you there for a moment,

11   Mr. Woodmansee.  What relevance does that have to the issue

12   before the Court?  How is that relevant?

13          MR. WOODMANSEE:  Here is the credit alert notice from

14   the credit reporting agency, Trans Union Corporation.  The debt

15   was written off and the credit reporting agency is notified by

16   the bank in April of this year that that bad debt charge-off in

17   the amount of 22,134 took place.  It certainly appears at this

18   stage of the game that they are trying to collect again, but

19   here is the other --

20          THE COURT:  Well, hang on for a minute.  I had a

21   question for you just a moment ago.  How is that relevant to

22   the proceedings here?

23          MR. WOODMANSEE:  The debt they are trying to collect

24   now has been written off.

25          THE COURT:  Does that mean that the bank is just out

1    that amount of money?

2         Well, let me back up and let me just ask a couple of

3    questions here and maybe you can answer those to my

4    satisfaction.  Number one, did there come a time sometime in

5    the past where you obtained a credit card from that bank?

6         MR. WOODMANSEE:  In 1988, 16 years ago I paid them

7    interest for 16 years.

8         THE COURT:  I see.  Did you use that credit card

9    during that period of time?

10        MR. WOODMANSEE:  Yes, Your Honor.

11        THE COURT:  Did you make payments on that credit card

12   during that period of time as well?

13        MR. WOODMANSEE:  We had a mutual agreement.

14        THE COURT:  What was that agreement?

15        MR. WOODMANSEE:  That I could use those funds if I

16   paid them a substantial amount of interest, which I did.  The

17   situation --

18        THE COURT:  You didn't have to pay them any interest

19   if you made the payments on a regular basis and paid it off in

20   full every month.  Wasn't that what the agreement said?  It is

21   only if you didn't make the full payment that interest would be

22   added to it?  Is that correct, or am I incorrect?

23        MR. WOODMANSEE:  No, you are correct.

24        THE COURT:  Okay.  In fact, the total payments were

25   not made for the use of the credit card on a monthly basis; is

1    that correct?

2              MR. WOODMANSEE:  Please repeat that.

3              THE COURT:  You would get a statement at the end of

4    the month.  You would make a payment but it wasn't for the full

5    amount of what you had used the credit card for so, therefore,

6    interest started being accrued; is that correct?

7              MR. WOODMANSEE:  Yes.

8              THE COURT:  To the point where it exceeded $19,000?

9              MR. WOODMANSEE:  Yes.

10             THE COURT:  Is that correct?

11             MR. WOODMANSEE:  Well, the minimum payments were made

12   each month.

13             THE COURT:  Just the minimum payments?

14             MR. WOODMANSEE:  Yes.

15             THE COURT:  But you were using it in excess of what

16   the minimum amount was?

17             MR. WOODMANSEE:  Yes.

18             THE COURT:  And you continued to use that for a

19   period of time?

20             MR. WOODMANSEE:  Yes, Your Honor.  Could I explain my

21   situation to you?

22             THE COURT:  Certainly.

23             MR. WOODMANSEE:  I maintained perfect credit for 80

24   years.  Upon my wife incurring Alzheimer's Disease, we had

25   substantial medical payments and nursing home care payments.

1           THE COURT:  Did you use the card for some of that,

2   medication, things like that?

3           MR. WOODMANSEE:  Well, I used all of my funds.

4           THE COURT:  I see.

5           MR. WOODMANSEE:  When she finally passed on, after

6   five years of those expenses, I didn't have anything left.

7           More of a problem was the fact that we were on

8   pensions and when she passed away, so did half of the money

9   income.  I probably should have taken bankruptcy at that time,

10   but I was trying to protect my credit rating and also establish

11   other sources of income to where I could pay off the credit

12   cards.  Maybe I was too honest for my own good.

13           In any case, for the next 26 months, which they are

14   outlined there, I paid them an extra $3,800 in interest and I

15   probably would have been better off if I would have taken

16   bankruptcy to start with.  But it turns out that nobody hires

17   you at that age, and you have to have an in-home business or

18   something, which I tried to establish unsuccessfully.  So at

19   the end of July, 2004, there was no way that I could continue

20   making the payments.  So actually this amounted to bankruptcy

21   in another form.

22           But at this stage of the game I don't even have

23   enough monthly income to pay for both food and medications.

24           THE COURT:  That is when you made the decision to

25   discontinue payment?

14

1          MR. WOODMANSEE:  I had no choice.

2          THE COURT:  Okay.

3          MR. WOODMANSEE:  I had no choice.  They were

4   circumstances beyond my control.  Of course at that time my

5   perfect credit rating of 80 years went down the drain along

6   with it.  I was probably too honest in trying to get new income

7   to continue paying them and save my credit, but I was

8   unsuccessful.

9          THE COURT:  I understand.

10          Anything more, Mr. Woodmansee, that I should know?

11          MR. WOODMANSEE:  Well, actually there are a couple of

12   other items.  There are consumer protection laws, one having to

13   do with that credit card agreements cannot be assigned to a

14   third party, and there are several cases where the appellate

15   courts have repeatedly ruled that a bank lender cannot

16   foreclose on any debt without presenting the original promise

17   to pay, the credit card agreement.  If the bank cannot present

18   the original promise to pay, the credit card agreement, then it

19   is if it does not exist.  So saith the appellate court cases.

20          THE COURT:  This material is material that you have

21   included in your papers and I have reviewed it.

22          MR. WOODMANSEE:  Thank you.

23          THE COURT:  Anything more?

24          MR. WOODMANSEE:  Well, basically this thing is that

25   they have not provided the original credit card agreement.  It

1    has been written off.  I have no means of paying.  If they

2    didn't use their insurance, which I think they should have, and

3    they surely had bankruptcy insurance, especially on unsecured

4    debts.  Even on secured debts, banks on mortgages demand that

5    the homeowner carry insurance.  I can't imagine that they

6    wouldn't carry insurance.  And the fact it was written off

7    opened up the window which gave them a chance to collect from

8    their insurance company.  If it is collected on an insurance

9    policy, the bank would be guilty of criminal fraud, trying to

10    collect twice on the same debt.

11         THE COURT:  That presupposes that the bank would end

12    up with that.  They may have to reimburse the insurance company

13    if in fact they got any money from that.  That is normally the

14    way it works, Mr. Woodmansee.

15         MR. WOODMANSEE:  The bottom line is that the debt had

16    to be written off and was written off.  As a result, the

17    defendant has no legal claim against the plaintiff.

18         THE COURT:  I understand your position.  Thank you

19    very much.

20         What I am going to do is I am going to prepare a

21    report and recommendation to Judge Benson in this case.  It

22    will be mailed out to the parties.  We have an address for you,

23    Mr. Woodmansee, of 587 South 300 East, Payson, Utah, 84651.

24         Is that a correct address?

25         MR. WOODMANSEE:  Yes, Your Honor.

1          THE COURT:  Counsel, we have 363 North University

2   Avenue, Suite 103, Provo, Utah, 84603, Post Office Box 1045.

3          MR. CHRYSTLER:  That is correct, Your Honor.

4          THE COURT:  Once that report and recommendation is

5   prepared, it will be mailed to you and you will have ten days

6   in which to file any objections that you may have to it.  Don't

7   let that go by, because that is a jurisdictional requirement.

8   If you don't file it within ten days, then it won't be

9   considered by the judge, so you need to make sure.

10         He, as I told you earlier, will either adopt the

11   report and recommendation, adopt only portions of it, or reject

12   it totally.  You may file those objections in writing with

13   Judge Benson in this Court, and then he may even want to have

14   another hearing, and I don't know whether he will or not, or

15   just rules on the papers.  Then he will rule on that.

16         Now, this is a motion for summary judgment, your

17   motion.  The standard under Rule 56 is quite clear.  If there

18   are factual disputes still out there, then summary judgment is

19   not appropriate.  Okay.  That is the usual standard.  So we'll

20   have to look at it and then you'll get my report and

21   recommendation.

22         Any questions?

23         MR. WOODMANSEE:  Do you have a copy of the credit

24   alert notice?

25         THE COURT:  If you attached it as in exhibit, I do.

1          MR. WOODMANSEE:  Do you have where it was written

2     off?

3          THE COURT:  I have that as an exhibit.  I think you

4     attached that.

5          MR. WOODMANSEE:  I think you probably have all of the

6     exhibits that we had there.

7          THE COURT:  All right.

8          MR. WOODMANSEE:  If not, I have a new set for you if

9     you need them.

10         THE COURT:  That is fine.  I have them right now.

11         MR. WOODMANSEE:  Okay.

12         THE COURT:  Anything more?

13         MR. WOODMANSEE:  No.

14         MR. CHRYSTLER:  No, Your Honor.

15         THE COURT:  We'll be in recess.

16         Thank you.

17         (Proceedings concluded.)

18

19

20

21

22

23

24

25

1    STATE OF UTAH        )
                           )

2    COUNTY OF SALT LAKE  )

3

4

5

6              I, R. Edward Young, do hereby certify that I am an

7    Official Court Reporter for the United States District Court

8    for the District of Utah;

9              That as such Reporter I attended the hearing of the

10    foregoing matter on _Aug 4_____, and thereat

11    reported in Stenotype all of the testimony and proceedings

12    had, and caused said notes to be transcribed into

13    typewriting; and the foregoing pages numbered from 1

14    to 18 constitute a full, true and correct report of the

15    same.

16              DATED at Salt Lake City, Utah, this 13th day of

17    _July_____, 2005.

18

19

20              Ed Young, United States Court Reporter

21

22

23

24

25